IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 15, 2017 Session

## BLUE WATER BAY AT CENTER HILL, LLC, ET AL. v. LARRY J. HASTY, ET AL.

**Appeal from the Chancery Court for Williamson County**
No. 43307     Deanna Johnson[1], Judge

_____

### No. M2016-02382-COA-R3-CV

_____

This appeal follows the trial court's confirmation of an arbitration award. There are four participating parties on appeal, the Appellant and three separate Appellees. With respect to the claims asserted by Appellee Blue Water Bay against the Appellant, we hereby vacate the trial court's orders and remand for further proceedings because the trial court erred in not allowing the Appellant pre-arbitration discovery regarding issues pertaining to arbitrability. With respect to the claims involving the other two Appellees, we reverse the trial court's orders due to the absence of a sufficient basis to establish arbitrability.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated in part and Reversed in part and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which BRANDON O. GIBSON and KENNY ARMSTRONG, JJ., joined.

Ben M. Rose and Joshua D. Arters, Brentwood, Tennessee, for the appellant, Larry J. Hasty.

William B. Hawkins, III and Eric G, Evans, Nashville, Tennessee, for the appellees, Blue Water Bay At Center Hill, LLC, and Edmond R. Queen.

Trajan Carney, Nashville, Tennessee, for the appellee, Greyhawk Development Corporation.

_____

[1] Prior to arbitration, the case was presided over by the Honorable James G. Martin, III.

## OPINION

## BACKGROUND AND PROCEDURAL HISTORY

This case involves a dispute among the Appellant, Larry Hasty ("Mr. Hasty"), and the Appellees, Blue Water Bay at Center Hill, LLC ("Blue Water"), Edmond Queen ("Mr. Queen"), and Greyhawk Development Corporation ("Greyhawk"). The genesis of the lawsuit lies in a 2007 loan granted to Greyhawk by Cadence Bank, N.A. ("Cadence"). Incident to Greyhawk's acquisition of loan proceeds from Cadence, which was evidenced by a promissory note in the amount of $3,100,000.00, Mr. Hasty, a corporate officer of Greyhawk, executed a personal guaranty. It is not disputed that Mr. Queen also signed a personal guaranty for payment of the same 2007 loan.

As is relevant herein, Mr. Hasty's guaranty contained an arbitration provision. In pertinent part, the provision provided that "[a]ny controversy or claim between or among the parties hereto including, but not limited to, those arising out of or relating to this Guaranty or any related agreements or instruments . . . shall be determined by binding arbitration[.]" Following the execution of the 2007 note, the loan documents were allegedly amended and transferred multiple times.

The present litigation commenced on July 1, 2014, when Blue Water and Mr. Queen filed a complaint in the Williamson County Chancery Court. The filed complaint set forth alternative counts for relief. Notably, the alternative claims that were advanced were not pursued jointly by the named Plaintiffs. That is, whereas the first count of the complaint was pursued exclusively by Blue Water, the alternative count was pursued exclusively by Mr. Queen. In the first count, Blue Water alleged that through a series of assignments of loan documents, it had become the holder of the most recent renewal of the original 2007 promissory note. It averred that because Greyhawk had not made any payments under the renewed note, Mr. Hasty was liable pursuant to his personal guaranty. Nevertheless, in recognition of the fact that Mr. Queen had also guaranteed payment of the note, Blue Water only sought to recover half of the loan amounts allegedly due and owing.

In the alternative to Blue Water's request for relief, Mr. Queen asserted a claim for contribution. In advancing this claim, Mr. Queen asserted that Cadence had previously filed suit against himself, Mr. Hasty, and Greyhawk in regard to outstanding loan payments. According to Mr. Queen, Cadence agreed, following a mediation, to accept $1,800,000.00 in satisfaction of its claims. Because he had allegedly "paid the entire amount necessary to satisfy Cadence Bank's claims," Mr. Queen sought to recover against his co-guarantor, Mr. Hasty, for contribution, having paid more than his pro-rata share.

After several months passed without the filing of an answer, Blue Water and Mr. Queen moved for a default judgment against Mr. Hasty in December 2014. However, following the filing of an answer by Mr. Hasty on January 14, 2015, the motion for default was later stricken pursuant to an agreed order. In his answer, Mr. Hasty generally contended that the claims against him should be dismissed, and he stated that he was without sufficient information or knowledge to admit or deny Blue Water's status in relation to the renewed promissory note. In addition, Mr. Hasty filed a third-party complaint against Greyhawk, asserting claims for statutory and common law indemnity.

Subsequent to the filing of Mr. Hasty's answer and third-party complaint, Greyhawk filed a motion to stay litigation pending arbitration pursuant to Tennessee's Uniform Arbitration Act, Tenn. Code Ann. § 29-5-301 *et seq*. In a legal memorandum filed contemporaneously with its motion to stay, Greyhawk noted that Mr. Hasty's guaranty contained a mandatory arbitration clause and contended that the claims in the lawsuit all arose out of the guaranty and related agreements. In response to Greyhawk's motion to stay, Mr. Hasty filed a motion to continue. Therein, Mr. Hasty contended that because he intended to challenge the arbitrability of his claims against Greyhawk, he was entitled to engage in pre-arbitration discovery prior to a hearing on the motion to stay. Mr. Hasty contended that discovery was necessary, in part, to verify the "litany of allegations" that Greyhawk had relied upon in support of its motion to stay. He further expressed a desire to challenge the validity of the specific arbitration clause sought to be enforced. Subsequent to Mr. Hasty's request for a continuance, Blue Water, Mr. Queen, and Greyhawk all filed responses disputing that any discovery was proper prior to a hearing on the motion to stay. Mr. Hasty thereafter filed a reply wherein he again noted that Tennessee law allows for pre-arbitration discovery.

A hearing on Mr. Hasty's motion to continue was held on July 10, 2015. During the hearing, the trial court appeared to express a willingness to allow some discovery prior to determining the question of arbitrability, stating as follows: "I've already indicated my inclination is going to be to . . . allow discovery on the question of whether the arbitration provision pertaining to the guarant[y] even applies to the obligations created by these notes." Although the court indicated that Greyhawk's motion to stay was set to be heard on August 21, 2015, it suggested that this future setting might not ultimately be necessary. Speaking to Mr. Hasty's counsel regarding the motion to continue, the trial court stated as follows:

> My ruling is that your motion is overruled. It's premature. You'll need to file a response to the motion to stay that's set for the 21st asking for leeway to take specific discovery. If you can fashion an order resulting from today's proceedings that's satisfactory, and not have to come here on the 21st, I'm happy to approve it. Because on the 21st I'm going to grant your client, Mr. Hasty, permission to pursue discovery on the question of whether the guarant[y], in fact, applies to these underlying obligations.

- 3 -

In response to the trial court's comments, Mr. Hasty filed an application on August 7, 2015 seeking leave to pursue discovery regarding the arbitrability of his claims against Greyhawk. He also filed a "motion to sever" on that date, requesting that the claims filed by Blue Water and Mr. Queen be severed from his own claims against Greyhawk if necessary. On August 17, 2015, Blue Water, Mr. Queen, and Greyhawk filed responses to Mr. Hasty's August 7 filings. Blue Water and Mr. Queen also filed a separate response to Greyhawk's motion to stay, wherein they asserted that all matters between all parties should be resolved in arbitration.[2]

On August 21, 2015, the trial court held a hearing on Greyhawk's motion to stay litigation and on Mr. Hasty's motion to sever and application for discovery. During the course of the hearing, which consisted entirely of argument of counsel, Mr. Hasty's counsel frequently expressed a desire to engage in discovery on the question of arbitrability. Although counsel for Greyhawk, Blue Water, and Mr. Queen indicated that papers attached to various court filings established Blue Water's status as a holder of the renewed promissory note and related loan documents, counsel for Mr. Hasty argued that he should be able to inquire into the legitimacy of the referenced transactions underpinning Blue Water's alleged status. We observe that the documents referenced by counsel for Greyhawk, Blue Water, and Mr. Queen were not actually introduced as evidence into the record at the August 21 hearing.

Among the specific issues discussed at the hearing were some of the allegations pertaining to the alternative contribution claim asserted by Mr. Queen. As noted earlier, Mr. Queen's claim asserted that because he had "paid the entire amount necessary to satisfy Cadence Bank's claims," he was entitled to recover against his co-guarantor, Mr. Hasty, for having paid more than his pro-rata share. During the hearing, Mr. Hasty's counsel expressed a desire to inquire into whether the loan obligations were previously extinguished before the alleged assignment to Blue Water. Counsel for Greyhawk argued to the trial court that, in light of the various referenced transactions, it was inaccurate to say that the underlying debt had been "paid off." According to Greyhawk's counsel, it was clear that Mr. Queen's company, PDQ Disposal, Inc., had purchased the note. In the trial court's view, answering this question was significant:

> And that's critical. That's a critical question here. And either this Court or an arbitrator has got to look at that issue. If PDQ just paid it off, that's one thing. If PDQ bought it and took an assignment of the note and deed of trust or the note and trust and guarant[e]es, all the collateral, in other words, then it's a different problem. And I can't imagine, frankly, that the lat[t]er didn't occur. It would be hard for me to conceive that PDQ didn't simply

[2] In advancing their position that the trial court should send all parties to arbitration, Blue Water and Mr. Queen adopted Greyhawk's motion to stay by reference, pursuant to Rule 10.04 of the Tennessee Rules of Civil Procedure.

buy it and take an assignment of the note and all the collateral that went with it. But that's a fact question that will have to be addressed by either this Court or an arbitrator.

Although the trial court later suggested that this would be a question for the arbitrator and that the arbitrator would be able to set the parameters of discovery, counsel for Mr. Hasty argued that "when you're challenging arbitrability, you get to discover arbitrability in [the trial court]."

Blue Water, Mr. Queen, and Greyhawk were not signatories to the guaranty containing the arbitration provision that was relied upon in support of the motion to stay, and Mr. Hasty simply wanted to be afforded some limited discovery to inquire into the various transactions that these parties were citing in support of their desire to arbitrate. Although the trial court found it "interesting" that there had been resistance to Mr. Hasty's desire to conduct discovery, it nevertheless expressed confusion as to why any discovery would be needed in light of the various documents that had been referenced by counsel for Blue Water, Mr. Queen, and Greyhawk. Mr. Hasty's counsel responded to the trial court's questioning on this issue by stating that, beyond the set of documents that had been referenced, Mr. Hasty should be able to explore whether those were actually legitimate transactions. Towards the conclusion of the hearing, the trial court stated that its inclination was to stay proceedings pending arbitration. Ultimately, however, it did not make a definitive ruling from the bench, and the matter was taken under advisement.

On September 11, 2015, the trial court entered an order holding that it was proper to stay litigation and compel the parties to enter into arbitration concerning all raised claims. As a corollary to this determination, it denied Mr. Hasty's motion to sever and his application to pursue discovery. In reaching its decision that all claims should be arbitrated, the trial court made a number of factual findings regarding the loan documents and transactions that had been referenced during the August 21 hearing. As previously noted, while these documents were not introduced as proof, they had been attached to court papers filed by the parties seeking arbitration. Although a close inspection of the trial court's order reveals that it attempted to qualify its language in a couple of places regarding the documents relied on by Blue Water, Mr. Queen, and Greyhawk,[3] it nonetheless treated these documents as proof and accepted them at face value with regard to the legitimacy of the underlying transactions referenced therein. In the trial court's opinion, no discovery was required because there was no need for any additional documents.

---

[3] For instance, on the second page of its order, the trial court stated as follows: "Although the Plaintiffs do not explicitly lay out the exact sequence of alleged events in the Complaint, the instruments that **purportedly** evince the following transactions are incorporated into the Complaint[.]" (emphasis added) Moreover, when discussing the fact that Greyhawk had provided documentation of the various transactions, the court stated that Greyhawk had "attach[ed] as exhibits to its Response all of the **purported** documentation of the agreements." (emphasis added)

In making its findings, the trial court noted that Mr. Hasty's guaranty was assignable, and as such, it reasoned that an assignment of the guaranty would allow the assignee to enforce the guaranty's arbitration provision. Interestingly, however, despite the trial court's attempt to trace the purported transfer of the loan documents among various non-signatories to the guaranty, the resulting findings were seemingly irreconcilable. At one place in its order, for example, the trial court recited as follows: "PDQ Disposal subsequently assigned its Loan Documents to Mr. Queen. On December 31, 2013, Mr. Queen assigned all of [his] rights under these transactions to Blue Water." However, the trial court's order also contained a finding that Mr. Hasty's guaranty, which included the arbitration provision, was ultimately assigned to Mr. Queen: "Subsequently, PDQ Disposal, which held the Guaranty, then assigned the Guaranty to Blue Water, which assigned the Guaranty to Mr. Queen[.]"

Although the trial court's specific reasoning is somewhat unclear in light of the apparent inconsistency of its findings, the trial court ultimately determined that every claim should be sent to arbitration because, in the view of the trial court, all claims were "intertwined" with Mr. Hasty's guaranty:

> Although the Plaintiffs and Greyhawk are not signatories to Mr. Hasty's Guaranty, the rights of the Plaintiffs and the obligations of Greyhawk depend upon Mr. Hasty's rights and obligations under the Guaranty. The case is intertwined around the Guaranty, which contains the arbitration provision, so the Court finds it is proper to stay the litigation and compel the parties to enter into arbitration of all claims of all parties.

Although Mr. Hasty requested permission to seek an interlocutory appeal following the trial court's September 11, 2015 order, the trial court denied his request.

Arbitration subsequently ensued regarding the claims of all the parties. Although the arbitrator entered an award against Mr. Hasty in Blue Water's favor, the claims asserted by Mr. Queen and Mr. Hasty were dismissed. Proceedings in the trial court resumed soon thereafter. On July 7, 2016, Blue Water filed an application to confirm its arbitration award. On July 18, 2016, Mr. Hasty responded to Blue Water's application and moved to vacate the arbitration award.

A hearing on Blue Water's application to confirm the arbitration award was later held on July 21, 2016. The trial court did not definitively rule on the application at that time, however, and on July 28, 2016, it entered an order stating that it would take the matter under advisement. In its July 28 order, the trial court informed Blue Water and Mr. Hasty that they could file additional replies to assist the court in making its ruling. On October 11, 2016, following the submission of additional filings by Mr. Hasty and Blue Water, the trial court entered an order confirming the arbitrator's award. This appeal followed.

- 6 -

**ISSUES PRESENTED**

In his brief, Mr. Hasty raises the following issues for review:

1. Whether the trial court erred in staying all claims of all parties in favor of arbitration;

2. Whether the trial court erred in denying the Appellant's request to take discovery regarding the arbitrability of the claims in this case; and,

3. Whether the trial court erred in granting [Blue Water's] Application for Confirmation of Arbitration Award and denying the Appellant's Motion to Vacate.

The Appellees contend that this appeal is frivolous, and they accordingly request damages pursuant to Tennessee Code Annotated section 27-1-122.

**DISCUSSION**

This case comes to us following the trial court's confirmation of the arbitrator's award. Although Mr. Hasty raises a number of specific arguments as to why the confirmation order is in error, he also raises a number of concerns related to the trial court's prior decision to compel arbitration on all claims. This appeal is the first opportunity Mr. Hasty has had to challenge the trial court's determination of arbitrability.[4] Under Tennessee's Uniform Arbitration Act ("TUAA"), appeals may be taken from:

(1) An order denying an application to compel arbitration made under § 29-5-303;

(2) An order granting an application to stay arbitration made under § 29-5-303(b);

(3) An order confirming or denying confirmation of an award;

(4) An order modifying or correcting an award;

(5) An order vacating an award without directing a re-hearing; and

(6) A judgment or decree entered pursuant to this part.

---

[4] We note that Mr. Hasty's attempts to pursue a Rule 9 interlocutory appeal and Rule 10 extraordinary appeal were unsuccessful.

Tenn. Code Ann. § 29-5-319. There is no appeal as of right from an order compelling arbitration. *See Peters v. Commonwealth Assocs.*, No. 03A01-9508-CV-00295, 1996 WL 93768, at *2 (Tenn. Ct. App. Mar. 5, 1996) (discussing the reach of Tenn. Code Ann. § 29-5-319).

As explained below, we are of the opinion that the trial court's orders ordering the parties to arbitration and confirming the arbitrator's award should be vacated as they concern Blue Water and reversed as they concern the other Appellees. With respect to the claims asserted by Blue Water, we conclude that the trial court erred in ordering arbitration without affording Mr. Hasty some limited pre-arbitration discovery. Concerning the other claims asserted in this case, we simply discern no basis on which they should have been sent to arbitration.

As a general matter, a court's enforcement of an arbitration provision is reviewed de novo. *Rosenberg v. BlueCross BlueShield of Tenn., Inc.*, 219 S.W.3d 892, 903 (Tenn. Ct. App. 2006) (citation omitted). An order on a motion to compel arbitration addresses itself primarily to the application of contract law and is accordingly reviewed with no presumption of correctness on appeal. *Id.* (citations omitted). Although parties cannot be forced to arbitrate claims that they did not agree to arbitrate, *Frizzell Constr. Co., Inc. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 84 (Tenn. 1999), "[a]rbitration is judicially and legislatively favored in Tennessee." *Wofford v. M.J. Edwards & Sons Funeral Home Inc.*, 490 S.W.3d 800, 808 (Tenn. Ct. App. 2015) (citation omitted). Under the TUAA, "[a] written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable save upon such grounds as exist at law or in equity for the revocation of any contract[.]" Tenn. Code Ann. § 29-5-302(a).

The purpose of arbitration is to promote the settlement of parties' disputes without judicial involvement, and as such, the TUAA limits the authority of a trial court to conduct proceedings prior to determining whether arbitration should be enforced. *Glassman, Edwards, Wyatt, Tuttle & Cox, P.C. v. Wade*, 404 S.W.3d 464, 467 (Tenn. 2013) (citation omitted). It is clear, however, that a trial court is able to oversee some proceedings incident to its determination of whether a claim is arbitrable. In fact, "[d]iscovery is appropriate if it is limited to matters raised in the motion to compel arbitration." *Id.* at 467-68; *see also Owens v. Nat'l Health Corp.*, 263 S.W.3d 876, 889 (Tenn. 2007) (holding that the trial court may allow discovery on whether the arbitration agreement was unconscionable).

There is not any dispute that the guaranty signed by Mr. Hasty contained an arbitration provision. However, Cadence, the party in whose favor Mr. Hasty executed the guaranty, has not participated in these proceedings. It is the Appellees, non-parties to the guaranty, who have sought to rely on the arbitration provision to avoid the maintenance of this lawsuit in a judicial forum. Despite not being parties to the guaranty

- 8 -

executed by Mr. Hasty in Cadence's favor, the Appellees contend that the loan documents were assigned, giving the assignee a right to compel arbitration. As we understand their arguments, the purported assignee is not the only party entitled to compel arbitration, but all claims were properly sent to arbitration because they are allegedly "intertwined" with the guaranty. Although we will address the contention that all claims are arbitrable under this "intertwined" theory, we first address the arbitrability of the claims of Blue Water, the purported assignee of the guaranty.

### Arbitrability of the Blue Water Claims

As previously noted, the exact sequence of events in this case is somewhat unclear. Whereas the Appellees argue that the loan documents and guaranty were ultimately assigned to Blue Water, who seeks to enforce the guaranty, the trial court's September 11, 2015 order contained inconsistent findings on this issue. Again, whereas one section of the trial court's order recited that the loan documents were ultimately assigned to Blue Water, another section specifically found that the guaranty was ultimately assigned to Mr. Queen. Assuming valid assignments did occur in this case, it is certainly important to know who came into possession of the guaranty inasmuch as it contains the agreement upon which the request for arbitration is predicated. As evident by the decisions of other courts, when a right to compel arbitration is claimed by way of an assignment, the purported assignee must have "proof of a valid assignment every time the right to compel arbitration was purportedly transferred." *Gemini Capital Grp., LLC v. Tripp*, 445 S.W.3d 583, 588 (Mo. Ct. App. 2013) (citations omitted); *see also Liberty Credit Servs. Assignee v. Yonker*, No. 2012-P-0096, 2013 WL 5221219, at *4 (Ohio Ct. App. 2013) (noting that assignee did not establish a chain of title so as to allow it to rely upon the arbitration clause). Here, although Mr. Hasty sought to inquire into the alleged transactions referenced by the Appellees, he was never given the opportunity to do so. The trial court was satisfied that the Appellees had attached documents purportedly evidencing these transactions to various court papers. However, no proof was actually introduced into evidence concerning these transactions, whether by testimony or affidavit. Moreover, no pre-arbitration discovery was allowed regarding whether the alleged assignments actually occurred or were legitimate.

"Decisions with regard to discovery matters are in the sound discretion of the trial court[.]" *Price v. Mercury Supply Co., Inc.*, 682 S.W.2d 924, 935 (Tenn. Ct. App. 1984). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citing *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). "A trial court's decision involving discovery must be viewed in the context of the issues being tried and the posture of the case at the time the request for discovery is made." *Price*, 682 S.W.2d at 935.

As already noted, there is no absolute rule restricting pre-arbitration discovery. Such discovery is proper when "limited to matters raised in the motion to compel arbitration." *Glassman, Edwards, Wyatt, Tuttle & Cox, P.C.*, 404 S.W.3d at 467-68. Because the arbitrability of a dispute depends upon an enforceable arbitration agreement, pre-arbitration discovery can encompass inquiry into whether the arbitration provision is unconscionable. *See Owens*, 263 S.W.3d at 889.

In the trial court, Mr. Hasty expressed a desire to conduct discovery to, among other things, inquire into the alleged transfers of loan documents/guaranty and to expose the unconscionability of the arbitration provision. Mr. Hasty's desire to inquire into the validity of the alleged assignments was fueled, in part, by his perception that the original complaint posed seemingly irreconcilable allegations. Whereas Blue Water alleged that valid commercial paper had been assigned through various transactions, Mr. Hasty noted that Mr. Queen alleged a claim for contribution, based on the notion that Mr. Queen had paid more than his pro-rata share under the guaranty.

The above matters touch on the arbitrability of Blue Water's claims in this case, and we are of the opinion that the trial court abused its discretion in not allowing *any* pre-arbitration discovery. Attempting to discover the unconscionability of the arbitration provision would no doubt bear on the arbitrability of Blue Water's disputes, and Mr. Hasty's ability to understand the facts pertaining to the alleged assignments of the guaranty is important to understanding whether Blue Water, in fact, possessed a contractual right to compel arbitration as has been argued. With respect to this latter point, the trial court's failure to make consistent findings regarding the ultimate assignment of the guaranty bolsters the conclusion that pre-arbitration discovery was appropriate and needed.

We note that the trial court itself had initially acknowledged that some questions pertaining to the alleged assignments of the loan documents remained open, including whether the note had, in fact, been assigned from Cadence. Although the trial court stated at the August 21, 2015 hearing that it would be hard for it to conceive that an assignment had not occurred as alleged by Blue Water and the Appellees, it acknowledged that it was a question of fact. Yet, that particular question of fact was ultimately resolved in its September 11, 2015 order, in the absence of any proof on the issue and without affording Mr. Hasty any pre-arbitration discovery. Of course, as we have already highlighted, other factual findings were also made pertaining to the alleged assignments without any proof or discovery, some of which were inconsistent.

At oral argument, counsel for Blue Water seemed to suggest that discovery was not needed prior to a determination of arbitrability because any "gap" or "hole" in the link of the various alleged assignments of the guaranty could have been discovered *in arbitration* and brought to the attention of the arbitrator at that time. Respectfully, because the alleged assignments bear on the ability of a non-party to the guaranty to

compel arbitration, we are of the opinion that discovery into the matter should have been allowed by the trial court.

Given our conclusion that the trial court erred in not affording Mr. Hasty any pre-arbitration discovery, the trial court's orders sending these claims to arbitration and confirming the decision of the arbitrator are therefore vacated and we remand the case for further proceedings consistent with this Opinion. We certainly do not intend to suggest that full discovery is appropriate on remand, nor do we hold that the entirety of the discovery Mr. Hasty previously attempted to propound to Blue Water should be allowed.[5] With respect to Blue Water, Mr. Hasty should only be entitled to conduct discovery on matters pertaining to the arbitrability of Blue Water's claims, and the trial court will certainly be within its discretion to limit the proceedings accordingly. *See Glassman, Edwards, Wyatt, Tuttle & Cox, P.C.*, 404 S.W.3d at 467-68 ("Discovery is appropriate if it is limited to matters raised in the motion to compel arbitration.").

In short, before any determination is made regarding the arbitrability of Blue Water's claims, some limited preliminary discovery should be allowed. To the extent any initial factual questions need to be resolved incident to a determination of arbitrability, the trial court should strive to include consistent findings on remand. As we have noted, the inconsistency of the trial court's findings in its September 11, 2015 order underscores the need for clarity of the facts underpinning the arguments for arbitration, and Mr. Hasty should be afforded an opportunity to conduct discovery regarding these facts and others that bear on arbitrability and the enforceability of the arbitration provision relied upon in this case. The trial court's wholesale denial of pre-arbitration discovery was improper.

## **Arbitrability of the Queen Claim Against Hasty and the Hasty Claims Against Greyhawk**

Unlike the arbitrability of Blue Water's claims, which is an issue that is subject to discovery on remand, we are able to opine herein on the arbitrability of Mr. Queen's contribution claim and the indemnity claims asserted by Mr. Hasty against Greyhawk. For the reasons set forth below, we have determined that these other claims were not properly sent to arbitration. Therefore, the trial court's orders are hereby reversed as they concern these other claims, and these other claims are properly subject to further judicial proceedings.

---

[5] In this vein, we note that counsel for Mr. Hasty stated as follows during the course of the August 21, 2015 hearing: "I'm willing to tailor our discovery as much as I can[.]" In Mr. Hasty's appellate brief, he seems to acknowledge that some of his discovery requests to Blue Water and Mr. Queen may perhaps not have been strictly limited to the question of arbitrability. He notes, however, that his requests to those parties, which were propounded at a time when neither had sought the benefit of a stay, "were naturally broader than were the discovery requests propounded to Greyhawk, which explicitly sought the benefit of a stay."

- 11 -

*Authority for Sending Nonsignatories to Arbitration*

Neither Mr. Queen nor Greyhawk are signatories to the guaranty executed by Mr. Hasty. Moreover, unlike Blue Water, they do not claim to have acquired a right to compel arbitration by way of an assignment. On what basis then can they compel arbitration of the claims involving them? That is the remaining question before us.

We have already noted as a general principle that an order on a motion to compel arbitration addresses itself primarily to the application of contract law. *Rosenberg*, 219 S.W.3d at 903. Thus, notwithstanding the favored position that arbitration now has in the eyes of the law, a party cannot be forced to arbitrate a claim that it did not agree to arbitrate. *Frizzell Constr. Co., Inc.*, 9 S.W.3d at 84. Although being a party to an arbitration agreement should therefore generally be viewed as a condition precedent to compelling the resolution of disputes in an arbitral forum, it is not an absolute requirement. Parties can become bound to a contractual arbitration provision absent their signatures.

Although there are not many Tennessee state court decisions specifically explicating the panoply of circumstances in which a nonsignatory can compel arbitration or be compelled to arbitrate a dispute, it is clear that the issue is dependent on the application of ordinary common law principles. *See Harvey ex rel. Gladden v. Cumberland Trust & Inv. Co.*, -- S.W.3d ---, No. E2015-00941-SC-R11-CV, 2017 WL 4700834, at *16 (Tenn. Oct. 20, 2017) (citing *Smith v. Multi-Fin. Sec. Corp.*, 171 P.3d 1267, 1272 (Colo. App. 2007)); *see also Safe Step Walk-In Tub Co. v. GreenworksUS*, No. 3:13-cv-00489, 2015 WL 2384033, at *2 (M.D. Tenn. May 19, 2015) (citations omitted) (noting that nonsignatories may be bound to an arbitration agreement under ordinary contract and agency principles). The federal courts have recognized at least five doctrines justifying the application of an arbitration provision to a nonsignatory: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel. *Doe #1 v. Deja Vu Consulting Inc.*, No. 3:17-cv-00040, 2017 WL 3837730, at *15 (M.D. Tenn. Sept. 1, 2017) (citations omitted). Thus, although a person may not have been a nominal party to an arbitration agreement, traditional principles of state law may allow claims involving that party to be submitted to an arbitral forum.

In this case, although not specifically stated, it appears that Mr. Queen and Greyhawk argue that they are entitled to compel arbitration on an estoppel theory. Specifically, as best as we can understand, Mr. Queen and Greyhawk argue that arbitration regarding all claims was proper because all claims asserted here are purportedly "intertwined" with the guaranty. Their focus on the "intertwinement" of claims is an argument frequently made in arbitration cases applying a *version* of the estoppel doctrine. *See, e.g., Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773,779 (2d Cir. 1995) (noting that some courts have been willing to estop a signatory from avoiding arbitration with a nonsignatory "when the issues the nonsignatory is

seeking to resolve in arbitration are *intertwined* with the agreement that the estopped party has signed" (emphasis added)). We note that when the trial court ordered that all claims were subject to arbitration, it appeared to endorse Mr. Queen and Greyhawk's argument, stating that "[t]he case is intertwined around the Guaranty[.]"

As far as our research has uncovered, there are no Tennessee decisions specifically applying this brand of estoppel against a signatory as a matter of Tennessee law. We did apply similar principles in our recent decision *Mid-South Maintenance Inc. v. Paychex Inc.*, No. W2014-02329-COA-R3-CV, 2015 WL 4880855 (Tenn. Ct. App. Aug. 14, 2015), and the trial court relied upon *Paychex* in connection with its decision regarding arbitration. As the trial court itself recognized, however, the arbitration agreement in *Paychex* was governed by New York law. *See id.* at *2. Therefore, in this appeal, we are required to consider whether a theory of estoppel based on the "intertwinement" of claims is valid as a matter of Tennessee law. Before we can adequately answer this question, it is appropriate to briefly review the manner in which other courts have treated estoppel arguments in the arbitration context.

### Background on "Estoppel" and the Intertwined-Claims Test

In the arbitration context, estoppel can work in two ways. First, the estoppel doctrine can function to prevent a nonsignatory to an arbitration agreement from avoiding arbitration with a signatory to the agreement. Of course, the inverse is also possible, as the estoppel doctrine can prevent a signatory to an arbitration agreement from avoiding arbitration with a nonsignatory to the agreement. *See generally E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 199-200 (3d Cir. 2001) (noting that estoppel can (1) work to prevent a nonsignatory from avoiding arbitration and (2) bind a signatory to arbitrate at the nonsignatory's insistence). The propriety of this latter application of estoppel is at issue in this appeal.

Because the cases applying estoppel against a signatory in other jurisdictions are both many and varied, we will not endeavor to present an exhaustive account of these courts' decisions here. However, we note that several decisions state that a nonsignatory is able to compel arbitration in one of two scenarios. First, estoppel is said to apply when the signatory must "rely" on the terms of an agreement containing an arbitration provision to assert its claims against a nonsignatory. *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) (citation omitted). It should be noted that "reliance" on an agreement is not always strictly limited to instances in which a signatory attempts to sue a nonsignatory for breach of contract or derive a nonsignatory's legal duties from the agreement. As discussed in greater detail below, "[m]any courts have found that equitable estoppel requires arbitration of non-contract claims so long as the claims refer to the contract, are intertwined with the contract, or presume the contract's existence." Richard Frankel, *The Arbitration Clause as Super Contract*, 91 Wash. U. L. Rev. 531, 585 (2014); *see also Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 758

- 13 -

(11th Cir. 1993) (noting that each of the signatory's claims "makes reference to" the contract agreement or "presumes the existence of such an agreement"). The second scenario in which estoppel is said to apply against a signatory is when a signatory raises allegations of concerted misconduct by both the nonsignatory and one or more signatories to the contract. *MS Dealer Serv. Corp.*, 177 F.3d at 947 (citation omitted). Here, we are concerned with the limits of the first of the aforementioned scenarios, which is often denominated as an "intertwined-claims test." *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000).

On its face, a recent statement from the previously-cited *Cumberland Trust* decision would suggest that the argument advanced by Mr. Queen and Greyhawk is untenable. In *Cumberland Trust*, the Tennessee Supreme Court remarked in a footnote that "a party should not be compelled to arbitrate claims that are merely 'intertwined with' contractual rights that arise from a contract containing a predispute arbitration clause." *Cumberland Trust & Inv. Co.*, 2017 WL 4700834, at \*21 n.39. Notwithstanding this broad statement, we are not inclined to conclude that it amounts to a rejection of an intertwined-claims test theory of estoppel—whatever specific form such a theory may take—in the context of a nonsignatory attempting to compel a signatory to arbitration. We take heed of the factual context of *Cumberland Trust*, which involved an attempt to compel a nonsignatory to arbitration, and observe that other courts have made the application of an intertwined-claims test theory contingent on whether the party pursuing estoppel is a signatory to the underlying arbitration agreement. *See, e.g.*, *Edwards v. Costner*, 979 So. 2d 757, 764 (Ala. 2007) (noting that although an intertwined-claims theory can apply when a nonsignatory attempts to claim the benefit of arbitration, it "is not applicable . . . when a signatory attempts to compel a nonsignatory third party to arbitrate claims it may have against a signatory"). As such, considered in its context, it is unclear to us that the Supreme Court's statement in *Cumberland Trust* should have any bearing on our analysis here.

Although the current state of Tennessee case law appears to be silent concerning the propriety of an "intertwined-claims test" in the present context, we are not without any guidance in reaching an ultimate answer. As we have noted, arbitration is a matter of contract, *Rosenberg*, 219 S.W.3d at 903 (citation omitted), and whether a nonsignatory can be implicated in arbitration hinges on the application of common law principles. Moreover, as our Supreme Court explained in *Cumberland Trust*, the legislative preference for arbitration is "intended to erase the traditional judicial antagonism for arbitration, not force parties into arbitration who are not otherwise subject to an arbitration agreement under ordinary contract principles." *Cumberland Trust & Inv. Co.*, 2017 WL 4700834, at \*16. It is with this understanding in mind that we note that many of the existing judicial approaches to this issue have received much criticism. According to one scholar, "[a]lthough courts purport to apply general contract law when interpreting arbitration clauses, they have in fact distorted contract law by creating special rules for arbitration clauses that make them enforceable in situations where other contracts are

not." Frankel, *supra*, at 533. As further explained below, we generally agree with this concern because we disapprove of the extent to which the "intertwined-claims test" theory of estoppel has been liberally expanded by some courts. Namely, although we agree that a signatory to a contract containing an arbitration provision should be estopped from avoiding the arbitral forum if the signatory seeks to hold a nonsignatory liable pursuant to the underlying agreement, we disagree that estoppel is proper merely because a signatory's claim "references" or factually "presumes the existence of" the contract containing the arbitration provision. To explain our reasoning on this matter, we find it necessary to present an analytical approach with which we do find favor before discussing our reservations of the judicial approaches with which we disagree.

### *Estoppel Predicated on the Signatory's Legal Reliance on the Agreement*

In our opinion, fairness dictates that a signatory should be estopped from denying the applicability of arbitration when the signatory seeks to hold a nonsignatory liable pursuant to an agreement containing an arbitration provision. Such a result is demonstrated in cases such as *Hughes Masonry Co., Inc. v. Greater Clark County School Building Corp.*, 659 F.2d 836 (7th Cir. 1981). In *Hughes Masonry*, a dispute arose from school building projects. The masonry contractor soon filed suit against the construction manager and the county school building corporation, the latter with whom the contractor shared a contractual relationship. *Id.* at 837-38. An arbitration provision was included in the contract between the contractor and the county school building corporation, and the contract also designated the construction manager that would oversee the projects at issue. *Id.* at 837. Although the construction manager moved to compel arbitration, the district court denied the motion. *Id.* at 838. On appeal, the contractor maintained that the construction manager was not entitled to compel arbitration because the manager was not a party to the agreement between the contractor and county school building corporation. *Id.* This argument was not ultimately availing, however, as the district court's order denying arbitration was vacated on appeal. In articulating the basis for its decision, the appellate court stated as follows:

> [W]e believe Hughes is equitably estopped . . . in this case, because the very basis of Hughes' claim against [the construction manager] is that [the construction manager] breached the duties and responsibilities assigned and ascribed to [the construction manager] by the agreement between [the Greater Clark County School Building Corporation] and Hughes.
>
> Hughes has characterized its claims against [the construction manager] as sounding in tort, i.e., intentional and negligent interference with contract. In substance, however, Hughes is attempting to hold [the construction manager] to the terms of the Hughes-Clark agreement. Hughes' complaint is thus fundamentally grounded in [the construction manager's] alleged breach of the obligations assigned to it in the Hughes-

- 15 -

Clark agreement. Therefore, we believe it would be manifestly inequitable to permit Hughes to both claim that [the construction manager] is liable to Hughes for its failure to perform the contractual duties described in the Hughes-Clark agreement and at the same time deny that [the construction manager] is a party to that agreement in order to avoid arbitration of claims clearly within the ambit of the arbitration clause. "In short, (plaintiff) cannot have it both ways. (It) cannot rely on the contract when it works to its advantage, and repudiate it when it works to (its) disadvantage." *Tepper Realty Co. v. Mosaic Tile Co.*, 259 F.Supp. 688, 692 (S.D.N.Y.1966). *See also Avila Group, Inc. v. Norma J. of California*, 426 F.Supp. 537, 540 (S.D.N.Y.1977) ("To allow (defendant) to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act.").

*Id.* at 838-39 (footnote omitted).

We find that cases like *Hughes Masonry* present an appropriate framework for applying an estoppel theory, although we note that not every court that has considered the issue agrees. *See Ervin v. Nokia, Inc.*, 812 N.E.2d 534, 542 (Ill. App. Ct. 2004) (referencing *Hughes Masonry* and other cases but declining to adopt "this expanded interpretation of equitable estoppel"); *see also B.C. Rogers Poultry, Inc. v. Wedgeworth*, 911 So. 2d 483, 492 (Miss. 2005) (noting that a traditional element of equitable estoppel is detrimental reliance). In our view, if a party is seeking to enforce a contract against another party, it is proper that equity binds them to accept the contract's benefits as well as its burdens.[6] Even some of the strongest critics of the expansion of estoppel in the arbitration context do not seem to dispute that the approach taken in cases such as *Hughes Masonry* is proper. *See* Frankel, *supra*, at 584 ("[A]pplying equitable estoppel might make sense where a signatory sues a non-signatory third party for breach of contract and claims that the third party is somehow bound by the contract.");[7] Alexandra

---

[6] We refer to this principle as an "estoppel" herein for purposes of the analysis, although we recognize that this principle may not require all the hallmarks of an "equitable estoppel" under the common law. *See Consumer Credit Union v. Hite*, 801 S.W.2d 822, 825 (Tenn. Ct. App. 1990) (noting the elements of equitable estoppel include, among other things, conduct which amounts to a false representation or concealment of material facts and reliance upon the conduct of the party estopped). As explained *infra*, although we conclude it to be fair that a party should be prevented from denying the force of an arbitration provision in an agreement when that party attempts to enforce the agreement against another party, which we will call an "estoppel," we do not endorse the extent to which the "estoppel" doctrine has been expanded by many courts in the arbitration context.

[7] As the same scholar summarizes elsewhere, "The stated purpose of equitable estoppel in arbitration is . . . to prevent a party who sues to recover on a claim that relates to the contract containing the arbitration clause from avoiding the contract's burdens, namely, compelled arbitration." Frankel, *supra*, at 581.

Anne Hui, Note, *Equitable Estoppel and the Compulsion of Arbitration*, 60 Vand. L. Rev. 711, 735 (2007) (arguing that *Hughes Masonry* may be a rare case where it was acceptable to use equitable estoppel to compel an unwilling signatory to arbitrate).

Our own Supreme Court applied a similar principle in *Benton v. Vanderbilt University*, 137 S.W.3d 614 (Tenn. 2004), although that case involved a signatory's attempt to compel arbitration against a nonsignatory. In *Benton*, a third-party beneficiary sought to enforce a contract entered into between a hospital and an insurance carrier. *Id.* at 615. The hospital filed a motion to compel arbitration because the underlying contract contained an arbitration provision. *Id.* at 616. Although the trial court denied the motion to compel arbitration, the Court of Appeals reversed. *Id.* at 617. Upon further review in the Supreme Court, the Court of Appeals was affirmed. *Id.* at 620. In affirming this Court's decision, the Supreme Court concluded that arbitration was proper "based on the general principle that a third-party beneficiary cannot enforce favorable terms of a contract while avoiding unfavorable terms." *Id.* Although the Supreme Court's reasoning was not nominally predicated on an "estoppel doctrine," it has subsequently explained that the principle in *Benton* is often referred to as an "estoppel" or "equitable estoppel" theory. *See Cumberland Trust & Inv. Co.*, 2017 WL 4700834, at *18 n.38.[8]

### Some courts' expansion of reliance

Although we reason that it is fundamentally fair to require a signatory to accept the "burdens" of a contract like arbitration if they seek to enforce its benefits against a nonsignatory, we are of the opinion that the required "reliance" on an agreement by an estopped party deserves further analysis. As previously noted, some courts have stated that a signatory party "relies" on an agreement when the signatory's claims "make reference to" or "presume the existence of" the agreement. *MS Dealer Serv. Corp.*, 177 F.3d at 947 (citation omitted); *Meister v. Stout*, 353 P.3d 916, 921 (Colo. App. 2015) (citation omitted) ("A signatory's claim against a nonsignatory relies on the agreement when it references or presumes the existence of the written agreement containing the arbitration provision."); *Sunkist Soft Drinks, Inc.*, 10 F.3d at 758 (noting that each of the signatory's claims referenced and presumed the existence of the agreement). We do not find this test to be an appropriate one for determining whether a signatory should be estopped from avoiding arbitration.

As David Sawrie has explained, in cases like *Hughes Masonry*, estoppel proceeds from the starting point of assent: "[The claims in *Hughes Masonry*] arose from and depended on the contract containing the arbitration agreement. The doctrine of equitable

---

[8] In recognition of the fact that the estoppel doctrine in the arbitration context is often distinct from the common law understanding of equitable estoppel, the Supreme Court stated that it would refer to the *Benton* principle as "third-party beneficiary theory." *Cumberland Trust & Inv. Co.*, 2017 WL 4700834, at *18 n.38.

estoppel established the plaintiff's assent to a range of disputes arising out of that contract." David F. Sawrie, *Equitable Estoppel and the Outer Boundaries of Federal Arbitration Law: The Alabama Supreme Court's Retrenchment of an Expansive Federal Policy Favoring Arbitration*, 51 Vand. L. Rev. 721, 736 (1998) (footnote omitted). According to Sawrie, however, the notion of assent is undermined in cases where the relationship between the claims and the contract is thin but the signatory is compelled to arbitrate due to an emphasis on the factual nexus between the signatory and nonsignatory. *Id.* at 741.

We agree with this sentiment. Compelling arbitration simply because a signatory's claim may bear a factual relation to the existence of an agreement does not necessarily implicate the same concerns as those cases in which a nonsignatory suffers potential liability because it allegedly breached obligations in a contract containing an arbitration provision. As Sawrie has explained, shifting focus away from a comparison of the signatory's claim and the underlying contract threatens to subvert the intent of contracting parties:

> The nexus prong of equitable estoppel threatens to privilege transactional relationships over contractual manifestations of assent. To equitably estop a party from resisting arbitration with a nonsignatory, a court must initially find a close connection between a party's claims against the nonsignatory and the underlying contract containing an arbitration provision. A party that assents to arbitrate claims arising out of a contract also assents to arbitrate those claims against a nonsignatory when the fundamental dispute is "intimately founded in and intertwined with the underlying contract obligations." However, [language in cases such as *Sunkist*] suggest that equitable estoppel will not automatically fail when the relationship between a party's claims and the underlying contract grows thin. Indeed, a close nexus between all of the relevant parties may support arbitration even when the connection between the claim and the complaint is weak. Therefore, the doctrine of equitable estoppel threatens to enforce arbitration against the intent of contracting parties.

Sawrie, *supra*, at 741 (footnotes omitted).

It is unclear to us on what principled basis the litigation of a claim collateral to an agreement renders the agreement and claim sufficiently intertwined so as to make a nonsignatory's invocation of estoppel against a signatory proper. At the outset we are faced with a situation in which the signatory and nonsignatory have no mutual assent to arbitrate. *See* Hui, *supra*, at 741 (noting that the ways courts have often applied estoppel in the arbitration context does not involve an "alignment of objectively manifested intent to be bound by the contract"). If the signatory is not truly relying on the contract containing the arbitration provision as a legal basis for his or her claims against the

nonsignatory, how can we fairly conclude the signatory should be estopped from denying an agreement to arbitrate with the nonsignatory? We cannot reach this conclusion. In our view, the intertwinement of a claim and agreement in this context should be measured in terms of whether the signatory attempts to enforce the agreement against a nonsignatory. In other words, when the signatory attempts to derive a nonsignatory's legal duties from the agreement containing the arbitration provision, the signatory should be estopped from denying the arbitration provision.[9]

An estoppel should not apply when a signatory's claim merely "references" or factually "presumes the existence of" the contract containing the arbitration provision, because like some courts have stated, we are of the opinion that a "but-for" factual relationship is not sufficient to warrant the application of an estoppel argument. *See Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1174 (11th Cir. 2011) ("There is, to be sure, a 'but-for' relationship between the loan agreement, which created the debt obligation, and the credit life insurance policy that gave rise to the Lawsons' claims against Life of the South. But that alone is not enough to warrant equitable estoppel."); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 F. App'x. 704, 709 (10th Cir. 2011) ("For a plaintiff's claims to rely on the contract containing the arbitration provision, the contract must form the legal basis of those claims[.]"). We, like many critics of the broad expansion of estoppel in the arbitration context, have concerns that a mere factual intertwinement presents a tenuous legal springboard for declaring that a signatory should be estopped from denying the absence of an agreement with a nonsignatory.[10] Again, as our Supreme Court has noted, the legislative preference for

---

[9] As David Sawrie has argued, estoppel is a "legitimate proxy of a party's intent to arbitrate" in such circumstances:

> A signatory's assent to a contract containing a broad arbitration provision signifies assent to the arbitration of an expansive range of disputes arising out of the agreement. When a signatory uses the terms of that contract to extend liability to a nonsignatory, the signatory's cause of action bears intimate association with the underlying contract. Indeed, the signatory's claims literally arise out of the underlying contract. The cause of action itself constructively renders the nonsignatory a party to the contract.
> The absence of the nonsignatory's assent to the contract and the accompanying arbitration provision is irrelevant. The signatory party's claims essentially force the nonsignatory's unwilling "assent" to the terms of the contract through an attempted imposition of liability. Because the claim itself forces assent upon the nonsignatory, the signatory party may not excise the arbitration provision from the contract by asserting the absence of an arbitration agreement between itself and the nonsignatory.

Sawrie, *supra*, at 757-58.

[10] As two commentators have suggested, the trend away from focusing on the relationship between the claim and underlying contract obligation has been based on "limited reasoning and questionable analysis." J. Douglas Uloth & J. Hamilton Rial, III, *Equitable Estoppel as a Basis for Compelling Nonsignatories to Arbitrate—A Bridge Too Far?*, 21 Rev. Litig. 593, 632 (2002). These two

arbitration is "intended to erase the traditional judicial antagonism for arbitration, not force parties into arbitration who are not otherwise subject to an arbitration agreement under ordinary contract principles." *Cumberland Trust & Inv. Co.*, 2017 WL 4700834, at *16.

Although the tests utilized by some courts seem to permit a finding of "intertwinement"—and therefore, estoppel—due to the mere factual dependence a signatory's claims may have on a contractual agreement, these approaches seem too far afield from establishing an assent to arbitrate under common law principles. As one scholar has argued:

> Although it may seem that courts are still tying estoppel back to the underlying contract, that language in practice turns out to have broad reach and really requires only that the claims relate to the contract in some way. As a result, the standard ends up being very similar to the standard used for determining whether claims against a signatory must be resolved in arbitration. A standard arbitration clause will cover any dispute that bears a "significant relationship" to the contract, "touches upon" the contract, or that has its genesis in the contract. Because many arbitration clauses are broadly written and interpreted liberally, only a dispute between signatories that is wholly unrelated to the contract will not be subject to arbitration. As a result, courts have conferred, through equitable estoppel, virtually the same rights to non-signatories as they have to signatories. This threatens to make equitable estoppel the exception that swallows the general rule that non-signatories cannot enforce arbitration provisions.

Frankel, *supra*, at 585.[11]

### *Application of the "estoppel" argument relative to Mr. Queen and Greyhawk*

As we have attempted to demonstrate above, we are of the opinion that a signatory to an agreement's arbitration provision should be estopped from avoiding arbitration

commentators express concern that the elevation of the expanded version of estoppel in many courts "is poised to overwhelm the original fundamental premise that a party cannot be compelled to arbitrate a matter without its agreement." *Id.*

[11] Notwithstanding the expansive approach taken by some courts, the concern about the relationship of a claim to a contract containing an arbitration provision, as opposed to the factual nexus between the parties, has not been lost on all. *See, e.g.*, *Wilson v. Waverlee Homes, Inc*., 954 F.Supp. 1530, 1535-36 (M.D. Ala. 1997) (noting that estoppel did not apply because the claims were not intertwined with the agreement except in an "utterly collateral sense"); *Ex parte Isbell*, 708 So. 2d 571, 579 (Ala. 1997) (relying on *Waverlee Homes* and noting that parties are not bound by an arbitration clause merely because it exists).

when the signatory attempts to hold the nonsignatory liable pursuant to the underlying agreement. It is not sufficient, however, that a claim merely references the agreement or presumes its existence; the agreement must form the legal basis for the signatory's claim. Deeming the signatory estopped on account of their legal reliance on the agreement is appropriate because equity should bind the signatory to accept the agreement's burdens alongside its benefits.

With the foregoing in mind,[12] we finally turn to the remaining claims under discussion. Specifically, we must address whether Mr. Hasty is estopped from denying that he has no agreement to arbitrate with Mr. Queen and Greyhawk. With respect to Mr. Queen, it is unclear to us how his claim against Mr. Hasty is arbitrable even under the expansive view of estoppel that we have rejected herein. Indeed, *his* claim, which is not brought directly pursuant to the guaranty but is rooted in an alleged contribution right, asserts a theory of recovery *against* Mr. Hasty. From our research, the alternative version of estoppel under discussion herein would involve a scenario in which a "signatory asserts a claim arising from a contract against a nonsignatory to that contract." *Meister*, 353 P.3d at 920. In that situation, estoppel applies "where a signatory must rely on the terms of a written agreement containing an arbitration provision to assert its claims against a nonsignatory." *Id.* at 921 (citation omitted). Thus, even if we operated under a broader understanding of "intertwinement" that equated reliance on an agreement with a mere factual nexus, it is unclear that the estoppel doctrine would work in Mr. Queen's favor under the cases we have read and cited. The intertwinement would be predicated on the relationship between his own claim and the agreement instead of the association between the claims of a signatory—here, Mr. Hasty—and the agreement. Such a scenario does not align with those cases in which a nonsignatory has been able to estop a signatory from avoiding arbitration. *See Van Zanten v. Energy Transfer Partners, LP*, 320 S.W.3d 845, 848 (Tex. App. 2010) (rejecting the availability of estoppel by noting that the nonsignatories who were attempting to offensively invoke an arbitration clause against signatories were not seeking to "estop" the signatories from anything insofar as the signatories did not seek to enforce one provision yet evade another with respect to a nonsignatory). Mr. Queen's contribution claim against Mr. Hasty is therefore not arbitrable.

We next turn to the dispute between Mr. Hasty and Greyhawk. As we have previously noted, Mr. Hasty sued Greyhawk asserting claims for statutory and common law indemnity. Given the nature of his claims, Mr. Hasty has not attempted to hold

---

[12] We note that we have not endeavored to address all possible permutations of "estoppel" that have been considered by other courts in the arbitration context. For example, this case does not involve a situation where a signatory brought a claim alleging concerted misconduct by a nonsignatory and one or more signatories to the contract. As previously noted, many courts recognize this as a basis to apply estoppel. *See MS Dealer Serv. Corp.*, 177 F.3d at 947 (citation omitted). Here, we have attempted principally to address the limits of an intertwined-claims test theory of estoppel in terms of whether a collateral relationship between a claim and agreement is sufficient.

- 21 -

Greyhawk liable pursuant to the guaranty such that it could be argued that his attempts to claim the benefits of the agreement should also preclude him from avoiding the burdens of arbitration. Indeed, his claims against Greyhawk do not legally "turn on" duties set forth in the guaranty. *See Ex parte Isbell*, 708 So. 2d at 578 (finding that the cases properly finding an estoppel "involved plaintiff-signatories, whose claims against defendant-nonsignatories actually *turned* on duties set forth in the contracts requiring arbitration"). No doubt, there is a "but-for" factual relationship between the assertion of Mr. Hasty's claims and the existence of the guaranty. For the reasons previously explained, however, we do not find such a relationship to be a legitimate basis for establishing estoppel. *See Lenox McLaren Surgical Corp.*, 449 F. App'x. at 709 (rejecting a "but-for" test and holding that the "contract must form the legal basis" of the plaintiff's claims). When viewed from the framework of cases such as the previously-discussed *Hughes Masonry* opinion, it is clear that Mr. Hasty's claims are not "intimately founded in and intertwined with the underlying contract obligations." *Hughes Masonry Co., Inc.*, 659 F.2d at 841 n.9.

In light of our discussion above, we conclude that the claims involving Mr. Queen and Greyhawk are not arbitrable.[13] The trial court's orders sending these claims to arbitration and confirming the decision of the arbitrator are therefore reversed. Because these claims are not subject to arbitration, they are subject to further judicial proceedings consistent with this Opinion.

### Request for Damages under Tenn. Code Ann. § 27-1-122

The Appellees all contend that they are entitled to damages pursuant to Tennessee Code Annotated section 27-1-122. Under that statute:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

Tenn. Code Ann. § 27-1-122. Because we do not find this appeal to be frivolous in light of our discussion herein, we reject the Appellees' claims for damages under the statute.

---

[13] Even if we were inclined to adopt a more expansive framework for estoppel than we have herein, it is unclear to us that the mere factual connections that exist in this case would be sufficient to compel Mr. Hasty to arbitration. Specifically, we note that the guaranty provides for the arbitration of disputes involving "parties." Other courts have held that such limiting language countenances against the notion that a signatory provided assent to arbitrate with a nonsignatory. *See, e.g., McPheeters v. McGinn, Smith & Co., Inc.*, 953 F.2d 771, 774 (2d Cir. 1992) (holding that a nonsignatory could not compel arbitration where the arbitration provision covered only disputes between the parties to the agreement).

## CONCLUSION

For the foregoing reasons, we vacate the trial court's orders as they pertain to Blue Water. The trial court's orders are reversed with respect to the claims involving Mr. Queen and Greyhawk. Costs of this appeal are assessed jointly and severally against the Appellees, Greyhawk Development Corporation, Edmond R. Queen, and Blue Water Bay at Center Hill, LLC, for all of which execution may issue if necessary. This case is remanded for the collection of costs, enforcement of the judgment, and for such further proceedings as may be necessary and consistent with this Opinion.

_____

ARNOLD B. GOLDIN, JUDGE